THIS DISPOSITION IS A
PRECEDENT OF THE TTAB

Mailed:
February 27, 2007

**UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**Trademark Trial and Appeal Board**

_____

Parfums de Coeur, Ltd.

v.

Lory Lazarus

_____

Opposition No. 91161331
to application Serial No. 76522317
filed on June 4, 2003

_____

Marcia B. Paul and Teena H. Lee of Davis Wright Tremaine LLP
for Parfums de Coeur, Ltd.

James I. Charne of Law Offices of James Charne for Lory
Lazarus.

_____

Before Seeherman, Drost and Cataldo, Administrative
Trademark Judges.

Opinion by Seeherman, Administrative Trademark Judge:

Parfums de Coeur, Ltd. has opposed the application of

Lory Lazarus to register BM BODYMAN and design,[1] as shown

below,

_____

[1] The mark was characterized as "BM BODYMAN and design" by the
USPTO when it entered the data for the application. We note that
applicant described his mark as "BODYMAN and design," and that
the parties have used both terms in their briefs. We will



# BODYMAN

for "entertainment services in the nature of an animated television series."[2]

Opposer has brought this opposition on the ground of likelihood of confusion, alleging it is one of the largest manufacturers of popularly-priced women's and men's fragrances; that in February 2000 opposer introduced its BOD MAN line of fragrance products for men; that opposer owns registrations for BOD MAN and for BOD for men's fragrances; that a significant feature of opposer's print and television advertising for its BOD MAN products is the "Bod Man," "a cartoonish and exaggerated rendering of a very strong and fit man with prominent muscles" (¶ 7) and that this figure also appears on displays and product packaging; that applicant's applied-for mark BM BODYMAN and design is confusingly similar to opposer's BOD MAN mark, and that

---

continue to use the Office's characterization of the mark in our decision, but we recognize that the letters BM are depicted as part of the design element.

opposer's products and applicant's television series are targeted to similar audiences, namely younger men.

In his answer, applicant admitted the allegations of opposer's paragraphs 4 and 5, namely, that opposer obtained federal registrations for the marks BOD MAN and BOD; and that opposer notified applicant by letter dated April 30, 2004 of its trademark registration to the BOD and BOD MAN marks and demanded that applicant abandon his application. Applicant otherwise denied the salient allegations in the notice of opposition. Applicant also asserted what he described as "defenses," but which are elaborations of his reasons why confusion is not likely.

The record consists of the pleadings; the file of the opposed application, and the testimony depositions, with exhibits, of Mark Laracy, opposer's president, and of applicant Lory Lazarus, both of which were taken by opposer. Opposer has submitted, under notice of reliance, status and title copies of its registrations for BOD MAN ("MAN" disclaimed)[3] and BOD,[4] both for "men's fragrances, namely,

---

[2]  Application Serial No. 76522317, filed June 4, 2003, based on Section 1(b) of the Trademark Act (intent-to-use).
[3]  Registration No. 2,571,581 issued May 21, 2002.
[4]  Registration No. 2,398,731 issued October 24, 2000, Section 8 & 15 affidavits accepted and acknowledged.  The status and title copy was furnished by the USPTO on June 2, 2005, during opposer's testimony period and prior to the filing of the Section 8 and 15 affidavits.  In accordance with Board policy, we have confirmed that Office records reflect the filing of these affidavits.  See TBMP §704.03(b)(1)(A) (2d ed. rev. 2004) and cases cited at footnote 142.

cologne, eau de toilette, aftershave, scented body sprays and personal deodorants"; applicant's responses to certain of opposer's interrogatories; and portions of the discovery deposition of applicant.[5] Applicant has submitted, under notice of reliance, opposer's responses to certain of applicant's interrogatories, and portions of his discovery deposition, with exhibits, submitted with opposer's consent.[6]

The case has been fully briefed.

As a preliminary matter, we note that, although throughout its notice of opposition opposer asserts likelihood of confusion solely with respect to the mark BOD MAN, in its brief it included the mark BOD in its discussion of the issue of likelihood of confusion. However, opposer pleaded ownership of the mark BOD in its notice of opposition, made a copy of this registration of record, elicited testimony from opposer's president about this mark during his testimony deposition, and applicant's attorney cross-examined the witness with respect to the use of BOD. Moreover, applicant discussed opposer's mark BOD in his brief on the case. In view thereof, we treat the pleadings

---

[5] Opposer also submitted, under notice of reliance, the file of applicant's application. However, this document is automatically of record pursuant to Trademark Rule 2.122(b).

[6] Applicant's motion to submit the discovery deposition indicates that it is with the consent of opposer, and in its brief opposer specifically listed applicant's submission of the

as amended pursuant to F.R.C.P. 15(b) to include a claim of likelihood of confusion with respect to opposer's mark BOD.

The record shows that opposer sells fragrances for women and men. Its first line was a series of designer imposter women's fragrances, which were advertised as smelling like famous designer brands, but were sold at a much lower price point. In January 2000 opposer introduced a men's line of fragrances under the marks BOD/BOD MAN. In the packaging the word BOD appears in very large letters, with MAN in smaller letters below and somewhat to the right of BOD. Thus, the same display on the packaging supports the use of both marks. The BOD/BOD MAN line began with fragrance body sprays, and when it was first launched its target customer was young men, ages 9-24. This demographic (or ages 12-25) remains its primary customer, although the product may be bought by men in their thirties or even older. It is a mass brand, which is affordably priced and is sold in mass merchandisers and drug stores. Wal-Mart is opposer's largest account, and in 2004 represented half of opposer's sales. The BOD/BOD MAN fragrance products are currently sold in 18,000-20,000 outlets, including international accounts. Opposer's total sales of the BOD/BOD MAN products was less than $8.6 million in 2001,

---

discovery deposition as constituting part of the record. Appendix to opposer's main brief, Item 7.

less than $9.7 million in 2002, almost $12 million in 2003 and less than $17 million in 2004.[7]

Opposer advertises primarily through television and movie theaters, but also advertises in periodicals such as Marvel Comics "The Incredible Hulk," "GameInformer," "Smackdown" and "Smooth." From the launch in 2000 through 2004 opposer has spent over $23 million advertising its BOD/BOD MAN products.[8] Opposer's president testified to its advertising plans for 2005 (his testimony was taken in October 2005), and he provided a schedule showing the television channels, programs and/or times the commercials were to run. This schedule shows that commercials were planned for a large number of channels and programs, including South Park and Late Night on the Comedy channel, various time periods on MTV, and Adult Swim on the Cartoon channel.

In addition to the body fragrance products, opposer introduced a room freshener called FUNK FIGHTER under the

---

[7] Opposer submitted records of its actual sales from 2000 through 2004, but marked them as confidential (Exhibit 11). However, opposer's president testified to some of its annual sales in testimony that was not filed under seal. In this opinion we have used the figures from the testimony that is of public record, but we note that the testimony does not take into account returned merchandise. Therefore, we have used the phrase "less than" to indicate that the net amount is somewhat lower than the numbers in the testimony.
[8] The exhibit showing the actual advertising figures (Exhibit 7), was marked as confidential. However, opposer's president, in non-confidential testimony, provided some advertising figures, and this is what we have quoted in our opinion.

BOD MAN line.  Opposer has not licensed its BOD/BOD MAN marks, but shortly before the testimony deposition of its president in October 2005, it was approached to license the BOD MAN mark for underwear, and declined that suggestion.

Applicant, Lory Lazarus, is an individual who, inter alia, is a writer, composer and performer.  He conceived the idea of a character called Bodyman in 1992 or 1993, and envisioned Bodyman as a superhero having only a torso.  He developed the Bodyman character more fully in 1999, and in October 2003 Mr. Lazarus completed a treatment for an animated television series.  In late 2003 he contacted an individual at Phase Four Productions, which produces television shows, about his program.  Although she showed interest, she said that Mr. Lazarus should shop his program around to the networks, and if anyone was interested she would take over at that point.  Mr. Lazarus met with Cartoon Network in July 2004 about his proposal, specifically to have them consider his series for their Adult Swim programming, which is "a late night block of wacky, quirky, offbeat, sometimes adult-oriented animated TV shows," but they turned it down.  Lazarus disc. dep., p. 60.

The Bodyman character is a superhero who is only a torso, with no arms, legs or head.  He sees with his nipples, which are drawn as eyes; he speaks through his navel; and he captures criminals by projecting his

intestines, which can act as a rope or as a lasso.  This character has an alter ego, an ordinary person who is also a torso, but is dressed in a shirt and tie, and has a pair of glasses resting on his collar.

The target audience for the television show is aged 18 to 34 or 40, and is both male and female.

In view of the submission of copies of its pleaded registrations, as well as the testimony regarding opposer's use of the marks BOD MAN and BOD, opposer has established its standing.  See Cunningham v. Laser Golf Corp., 222 F.3d 943, 55 USPQ2d 1842 (Fed. Cir. 2000).  Further, because opposer's registrations are of record, priority is not in issue.  King Candy Company v. Eunice King's Kitchen, Inc., 496 F.2d 1400, 182 USPQ 108 (CCPA 1974).  In any event, opposer has demonstrated prior use of its marks for fragrance products, such use having commenced in early 2000. Although applicant testified that he thought up the character Bodyman, and created drawings of the character in the 1990s, he made no overtures to people in the television industry with respect to his proposed series until 2003, and he has not as yet prepared an actual television show, let alone had such a show produced or shown on television.

This brings us to the issue of likelihood of confusion. Our determination of this issue is based on an analysis of all of the probative facts in evidence that are relevant to

the factors set forth in In re E. I. du Pont de Nemours & Co., 476 F.2d 1357, 177 USPQ 563 (CCPA 1973). See also, In re Majestic Distilling Co., Inc., 315 F.3d 1311, 65 USPQ2d 1201 (Fed. Cir. 2003). In any likelihood of confusion analysis, two key considerations are the similarities between the marks and the similarities between the goods and/or services. See Federated Foods, Inc. v. Fort Howard Paper Co., 544 F.2d 1098, 192 USPQ 24 (CCPA 1976). See also, In re Dixie Restaurants Inc., 105 F.3d 1405, 41 USPQ2d 1531 (Fed. Cir. 1997).

We turn first to a consideration of the marks. Opposer's marks are BOD MAN and BOD; applicant's mark is BODYMAN with a design of a torso wearing a cape bearing the initials BM. Opposer takes the position that BODYMAN is the dominant part of applicant's mark, and therefore that only the word BODYMAN should be compared with opposer's word marks. "If the dominant part of the composite mark is the word,… then the parties' word marks must be compared aside from the design." Brief, p. 12. This is not a correct statement of the law. Even if an element of a mark is dominant, this does not mean that other elements may simply be ignored in the likelihood of confusion analysis. Although it is permissible to give greater weight to a dominant element, marks must still be compared in their

9

entireties.  See In re National Data Corp., 753 F.2d 1056,

224 USPQ 749, 751 (Fed. Cir. 1985).[9]

Nor do we agree with opposer's position that the word

BODYMAN is the dominant element of applicant's mark.  As

depicted in the drawing, the design is prominently

displayed, being the largest element in the mark, and at the

top of the mark.  Further, the design is of a grotesque

image—a torso that acts as a face, with the nipples being

eyes and the navel acting as a mouth.  As a result, the

design is very noticeable and has the effect of catching the

eye and engaging the viewer before the viewer looks at the

word BODYMAN.  Because of the strong visual impact of the

design element, which also includes a cape with the initials

BM, reminiscent of a super hero costume, we find that in

appearance applicant's mark BM BODYMAN and design differs

from opposer's marks BOD and BOD MAN.  We also point out

that there are differences between the word BODYMAN and the

word BOD and, although not as great, there are also

differences between BODYMAN and BOD MAN.

Opposer points out that when customers refer to

applicant's mark, the design element will not be

---

[9]  Opposer appears to recognize this principle in another portion of its brief, where it has cited cases for the propositions that a disclaimer does not remove a disclaimed word from consideration in the confusion analysis, and that although a component of a composite mark is disclaimed, the mark must be viewed in its entirety.  Opposer's brief, pp. 14-15.

articulated, and therefore the relevant comparison is between BODYMAN and BOD MAN/BOD.  We agree that the similarities in sound between BODYMAN and BOD MAN are much stronger than the similarities in appearance,[10] although we point out that BODYMAN has three syllables, and the phonetic difference between BODYMAN and BOD MAN will be heard because this difference creates the extra syllable.  If the difference in pronunciation were the only differences between the marks, there would obviously be a much stronger case for the similarity of the marks.  However, it must be remembered that applicant's mark includes a prominent design element, and it is intended to be used for an animated television series.  Because television is a visual medium, the "consumers" of applicant's show, i.e., the viewers, will see the mark, and see the prominent design element.  Even if they recommend the program to others by word of mouth, it will be a recommendation for a television program, not for a fragrance product.  As for those consumers who have no familiarity with applicant's mark other than hearing it referred to as the name of an animated television series, if they encounter opposer's fragrance products sold under the mark BOD or BOD MAN, because of the differences between men's fragrances and an animated cartoon series, as

---

[10]   Clearly there are additional phonetic differences between BODYMAN and BOD per se.

11

discussed below, they would have no basis to associate the fragrance products with the television series.  Therefore, the similarity in the sound of the marks is not a dispositive factor when the marks are compared in their entireties.  Compare, Centraz Industries Inc. v. Spartan Chemical Co., 77 USPQ2d 1698 (TTAB 2006), in which likelihood of confusion was found between ISHINE in stylized form and ICE SHINE, both for legally identical floor cleaning products.  The present case, however, presents a situation similar to that in Steve's Ice Cream v. Steve's Famous Hot Dogs, 3 USPQ2d 1477, 1478-79 (TTAB 1987).  The Board found no likelihood of confusion between STEVE'S for ice cream and STEVE'S and design for restaurant services. The Board pointed to:

> obvious differences in the marks here. The design portion of applicant's mark is extremely suggestive of the fact that applicant's restaurants feature hot dogs. The highly stylized depiction of humanized frankfurters, prancing arm in arm to musical notes, creates a distinctive commercial impression. Even with the word "STEVE'S" appearing above the hot dog figures, applicant's mark is distinguishable from the registered mark of opposer, which is simply the word "STEVE'S" in block letter form.

Moreover, there are also differences in the connotations of the marks.  As used in applicant's mark, BODYMAN clearly refers to the "person" depicted in the design element, a cape-wearing superhero who is merely a

12

torso or "body." Opposer itself has acknowledged that the design portion "reinforc[es] the connotation created by the words of the mark." Brief, p. 13. Opposer's marks, on the other hand, are for BOD and BOD MAN. Although BOD has the connotation of "body," it means something more than simply "the entire material structure and substance of an organism, especially of a human being or an animal."[11] Rather, it is an informal or slang term that refers to a great physical specimen, a person with an excellent physique and/or one that is sexy.[12] It is this same connotation of BOD that applies to opposer's mark BOD MAN, in which MAN has been disclaimed, presumably because it is descriptive of goods for men. This connotation of BOD in BOD MAN is also conveyed in opposer's packaging, in which the word BOD appears in much larger letters, while MAN is shown under BOD, and off to the side, and as well as in opposer's

---

[11] The American Heritage Dictionary of the English Language, © 1970. The Board may take judicial notice of dictionary definitions. University of Notre Dame du Lac v. J. C. Gourmet Food Imports Co., Inc., 213 USPQ 594 (TTAB 1982), aff'd, 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983).

[12] We take judicial notice of the following dictionary definitions of "bod": n. *Informal* body: *You've got to have a great bod to look good in that bathing suit.*" The Random House Dictionary of the English Language, 2d ed. unabridged © 1987; n. *informal* a physique*: Roger was proud of his bod.* The New Oxford American Dictionary, 2d ed.© 2005*; n.* a body, especially a nice body. *You got a nice bod, Tom.* Comtemporary American Slang, 2d ed. © 2001. It appears that it was because BOD has this slang connotation that opposer's marks were accepted for registration, since if BOD meant only "body" or the structure of a human being, it would have been merely descriptive of body sprays, one of the goods listed in the registrations..

advertising, which features a drawing of a man with a "hunk" physique, and women saying "I want your BOD."

Accordingly, although we recognize that BOD means BODY, as used in the marks BM BODYMAN and design and BOD MAN/BOD, the term, and the marks as a whole, have different connotations. See In re British Bulldog, Ltd., 224 USPQ 854 (TTAB 1984) (no likelihood of confusion found between PLAYERS in stylized form for men's underwear and PLAYERS for shoes, based in part on the different connotations the marks have when used in connection with the respective goods). See also In re Sydel Lingerie Co., Inc., 197 USPQ 629 (TTAB 1977) (no likelihood of confusion found between BOTTOMS UP for ladies' and children's underwear and BOTTOMS UP for men's suits, coats and trousers).

Because of these differences in appearance and connotation, the commercial impressions of the marks differ as well. Applicant's mark conveys the impression of a grotesque superhero called BODYMAN because he consists of only a torso, while opposer's mark BOD conveys the impression of a great physique, and BOD MAN conveys the impression either of a men's product that causes one to be a great-looking or desirable man or, due to the subordinate element MAN, of a men's product called BOD. Opposer argues that the connotations and commercial impressions are similar because the design element in applicant's mark is a "nude

14

muscular torso" and this is "the same distinctive body type as the 'superstuds' used to market the BOD MAN products." Reply brief, p. 2.  However, while opposer's advertisements do indeed depict a male figure with an exaggerated "ripped" physique, this figure of a good-looking desirable man is far different from the grotesque, albeit muscular, torso that is so prominently displayed in applicant's mark.  Thus, we are not persuaded by opposer's argument and maintain our view that the marks differ in connotation and commercial impression.

Accordingly, when we compare the marks in their entireties, and although recognizing the aural similarities between BODYMAN and BOD MAN, we find that overall the marks are different, and that the factor of the similarity of the marks favors applicant.

The next du Pont factor we consider is the similarity of the goods and services.  As opposer has pointed out, it is not necessary that the goods and services of the parties be similar or competitive, or even that they move in the same channels of trade, to support a holding of likelihood of confusion.  It is sufficient that the respective goods of the parties are related in some manner, and/or that the conditions and activities surrounding the marketing of the goods are such that they would or could be encountered by the same persons under circumstances that could, because of

15

the similarity of the marks, give rise to the mistaken belief that they originate from the same producer. In re International Telephone & Telegraph Corp., 197 USPQ 910, 911 (TTAB 1978).

Clearly, opposer's men's fragrance products and applicant's animated television series are not similar or competitive or overlapping goods and services. However, opposer argues that they are related because the titles of television programs are used as trademarks for merchandising products. In support of this position, opposer has cited, inter alia, Turner Entertainment Co. v. Nelson, 38 USPQ2d 1942 (TTAB 1996),[13] in which the Board found likelihood of confusion between GILLIGAN'S ISLAND for "suntan oil, suntan lotion, sunblock, sunless tanning lotion, after sun moisturizing lotion, lip balm, hand and body lotion, hair shampoo and body bar soap and GILLIGAN'S ISLAND for entertainment services in the nature of a television series.[14] The Board stated in that case that "[i]t is

---

[13] The cases cited by opposer in support of its position that television program marks and retail products are related are, with the exception of Turner, cases that were brought in state or federal courts and involve different issues and fact situations. Because of this, we have concentrated on the Turner case in our discussion herein.
[14] Opposer quotes the Board as noting in that decision that "it has become customary in both the television and motion picture film industry for the owners of works such as television series and feature films to use, or license the use of, the names of these properties and the names and likenesses of the characters therein for merchandising on other goods and services." Brief, p. 17. In point of fact, although this quote appears in the opinion, it is reported by the Board as a statement made in the

common knowledge and, in the present case, undisputed that video games, t-shirts, beach towels, caps and other logo-imprinted products are used as promotional items for a diverse range of goods and services, not to mention for specific television shows and movies." Id. at 1944. Although opposer recognizes that, in these cases, it was the owner of the television series that was the plaintiff and who claimed that another's later use of the mark on products was likely to cause confusion, opposer asserts that it is irrelevant that in the present case the mark was first used on fragrance products, with applicant later using the mark for a television series, and that the principle of the relatedness of television entertainment services and products still obtains. In support of this position, opposer points to Seligman & Latz, Inc. v. Merit Mercantile Corp., 222 USPQ 720 (TTAB 1984), in which the defendant's mark ARPEL for clothing was found likely to cause confusion with ADRIEN ARPEL for beauty products; opposer states that in that case "the Board found irrelevant the fact that typically a mark is first used on clothing and then expanded into beauty products." Brief, p. 18.

It would appear to be opposer's position that once television services and goods have been found to be related

---

declaration of one of the witnesses, rather than a finding by the Board.

in one case, they must be deemed related in all cases, no matter what the circumstances of the particular case. However, as has been frequently stated, each trademark case must be decided on its own merits. While we may look to other cases for guidance, these cases do not present hard and fast rules as to when confusion is likely and when it is not. Thus, there is no general rule that television programs and products are related goods and services despite the fact that likelihood of confusion has been found in some cases involving marks used for a television series and for goods. It is still opposer's burden to show that its goods are related to the applicant's services.

In <u>Turner</u>, the Board relied heavily on the fame of the opposer's mark and opposer's licensing of that mark for various products in finding likelihood of confusion between GILLIGAN'S ISLAND for suntan lotion and other sun tanning products and GILLIGAN'S ISLAND for a television series: "As is clear from the evidence, opposer's GILLIGAN'S ISLAND television series is well known. Further, as a result of this notoriety, the mark has been the subject of licenses." Turner Entertainment Co. v. Nelson, <u>supra</u> at 1944.

> This common trade practice [the licensing of commercial trademarks for use on "collateral" products] is reflected in the record before us, which shows that opposer has actively licensed its GILLIGAN'S ISLAND mark as a result of the popularity of the long-running syndication of the television series

18

> under the same mark. According to the undisputed evidence, opposer has licensed its mark for use on a wide variety of collateral products, including clothing items, beach towels, beach bags, can coolers, pinball machines, video games, mugs and umbrellas. All of these uses promote the GILLIGAN'S ISLAND television series.

Id. The marks in that case were also identical. In addition, the Board noted that its conclusion that confusion was likely was also supported by the fact that the applicant was attempting to register the mark for sun tanning products, and there was an obvious association between such goods and a television series based on the theme of castaways on a tropical island in the Pacific.

There are clear factual differences between the Turner case and the present situation. The first is obviously that here opposer uses its marks for products, and it is applicant, as the later user, that seeks to register his mark for a television series. Although opposer asserts that it is irrelevant that the product entered the marketplace prior to the entertainment services in terms of whether the goods and services are related, we think that this factual difference is significant. Although in certain circumstances consumers might expect a mark for a television series to be used on collateral products, they are not likely to assume that a mark that is used for men's fragrances has been expanded to identify a television

series.  Certainly there is no evidence in the record to support such a conclusion.  As noted above, opposer takes the position that it can rely on those cases in which confusion was found between marks used on television entertainment services and products, even though in those cases the plaintiff was the owner of the television series and was claiming that another's later use of the mark on products was likely to cause confusion.  Opposer cites Seligman & Latz, Inc. v. Merit Mercantile Corp., supra, for the proposition that the order of entry into the market is irrelevant, and that if there is a likelihood of confusion between marks used on television entertainment services and products, it does not matter whether the first user of the mark uses it for television entertainment services  (which is the situation in all the cases in which confusion was found to be likely) or uses it for a product.

Seligman involved a defendant who was attempting to register ARPEL for clothing, despite the plaintiff's use and registration of the designer name ADRIAN ARPEL for cosmetics and beauty services.  The defendant in that case had tried to discount testimony about the use of designer names for both clothing and cosmetics by pointing out that "almost all of these individuals were initially known as clothing or accessory designers and … their names as marks were used

first in the clothing and not in the cosmetic or beauty care field." The Board did not accept this argument:

> That is to say, purchasers acquainted with the fact that companies are selling items of clothing and cosmetic or toiletry products under the same designer's name are not likely to engage in the kind of reasoning applicant advances but are rather most likely to believe, because of the close relationship and association of names in these related fields, that applicant's clothing items and opposer's cosmetic and beauty care products and services have the same source, or at least are produced under license from the designer.

Id. at 723. The Board's comments were made in response to the defendant's attack on the plaintiff's evidence showing that, where designer marks are concerned, clothing and cosmetics are related goods. The Board found that designers used their marks for both clothing and cosmetics, and the public would view these goods as related when designer marks were used on them, even though the plaintiff used its mark on cosmetics, rather than following the general pattern of first using its mark on clothing and then expanding into cosmetics. We do not regard this case as standing for a general proposition that the time of entry into the market is irrelevant; while it might have been irrelevant whether plaintiff first used its mark on cosmetics rather than clothing, the key fact was that plaintiff had a designer name mark, and because designer name marks are used on

21

cosmetics and clothing, the goods were related in terms of the likelihood of confusion analysis.  There is certainly nothing in the opinion to indicate that if goods were found to be related in one case, they must be considered related in all cases or, extrapolating to the present situation, that it would make no difference to the analysis if it were the defendant who had the television series mark rather than the plaintiff.

Nor has opposer established a case of reverse confusion, in which people familiar with applicant's television series (should it ever be produced) would be likely to associate the mark for that series with a men's fragrance.  As opposed to the cases involving television program marks cited by opposer, here there is no evidence that applicant's mark has been used, much less that it is famous.  Fame, of course, was a major factor in the <u>Turner</u> case, the Board noting at several points in its rather brief decision the notoriety of the opposer's GILLIGAN'S ISLAND mark: "nor does applicant dispute the extensive use and the resultant notoriety of opposer's GILLIGAN'S ISLAND mark"; "opposer's GILLIGAN'S ISLAND television series is well known"; "as a result of this notoriety"; "well-known GILLIGAN'S ISLAND mark of opposer."  Turner Entertainment Co. v. Nelson, <u>supra</u> at 1944.  Nor has opposer shown that men's fragrances are the type of product for which

22

applicant's mark would be used as a merchandising mark. There is no evidence in the record that marks for entertainment services are typically licensed for use on fragrance products. See Blue Man Productions Inc. v. Tarmann, 75 USPQ2d 1811 (TTAB 2005) (entertainment services and cigarettes found not to be related, opposer failed to show that cigarettes or tobacco are products for which owners of merchandising marks would license their marks). Turner lists a number of items that can be the subject of collateral merchandising, e.g., caps, t-shirts, beach towels, linens and glassware, but fragrance products are not among them. Certainly there is nothing in the record to suggest a connection between a superhero consisting of a torso and men's fragrances, such that consumers would be likely to assume a connection between a television series about such a character and men's fragrance products.

Moreover, merchandising marks are normally identical to the primary mark, since it is because of the primary mark that consumers wish to purchase the licensed products. In Turner, as previously noted, the marks were identical, and the Board specifically found that "opposer has actively licensed its GILLIGAN'S ISLAND mark as a result of the popularity of the long-running syndication of the television series under the same mark." Turner Entertainment Co. v. Nelson, supra at 1944 (emphasis added). As discussed above,

23

applicant's mark and opposer's marks differ significantly because of the prominent torso design in applicant's mark, and even the words themselves--BODYMAN vs. BOD and BOD MAN-- are different.  Because this design element, which includes the letters BM, is not part of the mark on opposer's fragrance products, consumers would not be likely to view the products as merchandised products related to applicant's television series.[15]

Accordingly, the factor of the relatedness of the goods and services favors applicant.

The third du Pont factor is the similarity or dissimilarity of the channels of trade.  Opposer's goods are fragrance products that are sold in mass market retailers such as Wal-Mart and Kmart and in drugstores.  Further, because the identification in opposer's registrations does not limit the goods to any specific channels of trade, we must deem the goods to be sold in all channels appropriate for men's fragrances, which would include, for example, department stores and cosmetic and beauty supply stores.

---

[15]  Opposer also relies on Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd, 604 F.2d 200, 203 USPQ 161 (2d Cir. 1979) for the principle that consumers need not believe that the owner of the mark actually produced the infringing goods, but only that the owner sponsored or otherwise approved the use of the trademark.  We have no quarrel with this principle.  However, as opposed to the Dallas Cowboys case, which involved the use of a virtually identical uniform (the trademark), here, for reasons discussed supra, we find that the marks are different, such that consumers are not likely to believe that there is an association or sponsorship between opposer's goods and applicant's services.

Applicant's services, on the other hand, are a television series.  These channels of trade are clearly different. Opposer argues, however, that its products and applicant's services target the same category of people and would be marketed primarily through the same means--national television advertising.  Opposer asserts that its products are heavily promoted through television commercials on the same channels that would be likely to broadcast and run promotions for applicant's BODYMAN television show.  In this connection, opposer notes that its commercials have run on the Cartoon Network and Comedy Central channels, and applicant has tried to sell his series to those channels.

The mere fact that opposer may advertise its products on the same cable television channels on which applicant's television program, or promotions for his television program, is shown, is not enough in this case to demonstrate that the factor of the channels of trade favors opposer.[16] Because virtually everything can be advertised and/or promoted through television, the common use of television for such advertising is not a sufficient basis to say that

---

[16]  The record shows that some of opposer's commercials have run during the Cartoon Network's "Adult Swim" programming, and applicant had pitched his show to the executives for Adult Swim, an offer which Adult Swim declined.  To the extent opposer suggests that it might have been possible, had applicant's show been accepted, for opposer's commercials to run during the cablecast of applicant's show, or in close proximity thereto, we think that confusion would still be unlikely because of the differences in the marks.

goods and services are sold through the same channels of trade. Even if we accept that commercials for opposer's products may appear on the same channels that viewers of applicant's series may watch, so that these viewers could be exposed to both opposer's products through the commercials and applicant's programs and/or ads for the programs, these viewers would know about the BODYMAN character that is the subject of the television series, including the connotation of the word BODYMAN in the mark. They would also be familiar with the visual appearance of the mark, which includes the design element. We see no basis for them to make a connection between this mark, used for an animated television series about a superhero that is a torso, with opposer's marks BOD and BOD MAN for men's fragrances even if they encountered commercials for opposer's products while watching television.

We also note opposer's point that it promotes and sells its products through the Internet, and that applicant's television series might be promoted through the Internet, such as through a website for a cable channel on which the television series would appear. Even if we accept that opposer's products and applicant's television series could be promoted through the Internet, the mere fact that goods and services may both be advertised and offered through the Internet is not a sufficient basis to find that they are

26

sold through the same channels of trade. The Internet is such a pervasive medium that virtually everything is advertised and sold through the Internet. We therefore need something more than this general fact in order to show that "the conditions and activities surrounding the marketing of the goods [and services] are such that they would or could be encountered by the same persons under circumstances that could, because of the similarity of the marks, give rise to the mistaken belief that they originate from the same producer." In re International Telephone & Telegraph Corp., supra at 911. For example, if the goods and services were promoted or offered through the same website, that might constitute a circumstance that could lead to likelihood of confusion. However, merely because the medium of the Internet is involved is not a sufficient basis to show that the conditions and activities surrounding the marketing of the goods and services are such as to lead to confusion.[17]

---

[17] Opposer also suggests that merchandise related to applicant's television series might be offered through a website for a cable channel that "broadcasts" applicant's television series. This, of course, is rank speculation. And, in point of fact, there is actually no evidence of record to establish that cable television companies have websites through which they promote or offer merchandise related to the television series they show. During the testimony deposition that opposer took of applicant, opposer's attorney showed applicant printouts of a website. Applicant was not actually familiar with the pages that were shown to him, and it was opposer's attorney who represented that the pages were from a particular cable channel's website. Thus, the exhibits were never authenticated. Further, the issue of whether there would be likelihood of confusion between opposer's marks and goods and goods on which applicant might use his mark in the future is clearly not before us. Moreover, even if we

The factor of the channels of trade favors applicant.

With respect to the factor of the customers and the conditions of purchase, applicant has stated that his television series will be aimed at people ages 18-34 or even 40. Opposer's men's fragrance products were initially intended to appeal to males between 12 and 24, although opposer's president testified that the people who bought them included men in their twenties, and even older. In any event, opposer's registrations contain no restrictions, and we must therefore assume that its fragrance products can be used by all men, including those in applicant's intended demographic. Opposer's products may be purchased by both the users and by women who buy them as gifts.

The parties' goods and services, therefore, must be deemed to be sold or offered to the same consumers, who are the members of the general public. These consumers cannot be said to have a particular sophistication about these goods and services. Moreover, the goods and services would not be purchased with a great deal of care. Applicant's television series would be "free,"[18] and the decision to

---

accepted all of this speculation and assumed, <u>arguendo</u>, that there may be licensed items for applicant's television series that would be offered through a television channel's website, as we stated above, the mere fact that goods are offered through the Internet on separate websites is not a sufficient basis for us to find that the goods are sold in the same channels of trade.

[18] Although cable and satellite television service is purchased, with the exception of pay-per-view selections, there is normally no additional cost for a specific program provided through such media.

watch the program might well be made on impulse. Opposer's fragrance products are designed to appeal to the mass market, and are sold at a relatively low price point, as compared with designer fragrances. Thus, the decision to buy one of these products might be made on impulse, and in any event is not likely to be the subject of great deliberation or care. Accordingly, we find that this du Pont factor favors opposer. However, it is far outweighed by the factors of the differences in the marks and the goods/services. That is, because there is no clear relationship between fragrance products and an animated television series, we do not think that, even on impulse, a viewer will tune in to applicant's television program because he thinks there is a connection with opposer's products. Similarly, even if a purchaser chooses his fragrance product on impulse, because of the differences in the marks and the goods/services, he is not likely to assume that the source of the goods is associated with the source of the television program.

The next du Pont factor we consider is the fame of opposer's marks. Using the figures reported in the testimony deposition of opposer's president and in opposer's brief,[19] opposer's sales of BOD/BOD MAN products amounted to

---

[19] As noted previously, the exhibits providing actual sales and advertising figures were filed under seal. Therefore, we will refer here to the figures set forth in opposer's brief and in

under $8.6 million in 2001, under $9.7 million in 2002, almost $12 million in 2003 and under $17 million in 2004, and since the inception of the product line opposer has spent $23 million in advertising, including $2.5 to $6 million annually on television advertising.  These figures indicate that opposer, which has used its marks since 2000, has achieved some degree of success with its BOD/BOD MAN brand.  However, the evidence falls far short of demonstrating that its marks are famous.  While opposer has not attempted to put these figures in perspective,[20] a report opposer submitted that was taken from information prepared by Information Resources Inc., a packaged goods consumer product movement monitoring service, does give us some basis for comparison.  In the last quarter of 2004, the total dollar sales figures for brands in the "men's fine fragrance category--mass" was $61.8 million.  Of this number, opposer's sales were $1.5 million.  Many brands had higher sales figures, including Coty Stetson with $3.8 million, Coty Adidas Moves with $3 million, Curve For Men with $2.8 million, Davidoff Cool Water with $2.5 million, and Tommy with $1.7 million.  Although during that quarter

opposer's president's testimony deposition, both of which are part of the public record.

[20]  "Raw numbers of product sales and advertising expenses may have sufficed in the past to prove fame of a mark, but raw numbers alone in today's world may be misleading…. Consequently, some context in which to place raw statistics is reasonable."

opposer's BOD MAN fragrance products ranked number one in unit sales, such a ranking in a single quarter, and representing a 124% increase from the previous quarter, does not indicate a consistent pattern of significant market share, in a total market which opposer has limited by defining it narrowly.[21]  We also note that opposer compares its figures with those in Specialty Brands, Inc. v. Coffee Bean Distributors, Inc., 748 F.2d 669, 223 USPQ 1281 (Fed. Cir. 1984), in which the involved mark was found to be famous.  Opposer states that the plaintiff in that case had annual sales of $25 million and total advertising expenditures exceeding $3 million.  Opposer has omitted the fact that the plaintiff in Specialty Brands had used its mark for 40 years, as compared with opposer's use since 2000.  Moreover, the appeal in that case was decided in 1984; thus, those figures represent sales and advertising as of the early 1980's.  Certainly comparable figures twenty years later would be significantly higher.[22]  As opposer's

Bose Corp. v. QSC Audio Products, Inc., 293 F.3d 1367, 63 USPQ2d 1303, 1309 (Fed. Cir. 2002).

[21]  Even limited sales can appear to be impressive if one narrowly defines the universe of products.

[22]  Opposer also cites to Estee Lauder, Inc. v. Cinnabar 2000 Haircutters, Inc., 218 USPQ 191 (SDNY 1982), asserting that "advertising expenditures of more than $1.5 million and sales of more than $40 million demonstrated strength and fame of mark." Brief, p. 23.  That case involved a claim under Section 368-d of the New York General Business Law, which the Court specifically stated did not involve the Lanham Act claim of likelihood of confusion.  Moreover, the ruling in that case was that the plaintiff's mark was distinctive.  No mention was made of the "fame" of the mark.  Nonetheless, even if the Court had found the

president stated, "one of the constants in the advertising business has been 10 to 15 percent increases every single year, in terms of the cost of advertising time." Test. dep., p. 11. Accordingly, we cannot find opposer's BOD/BOD MAN marks to be famous.[23]

The only other du Pont factor discussed by the parties is that of actual confusion. There is no evidence of any instances of actual confusion. However, because applicant has not yet used his mark for his entertainment services, and at best has made only limited, sporadic efforts to sell his series to a television producer or channel, there has been no opportunity for such confusion to occur. Accordingly, we regard this factor as neutral.

After considering all of the relevant du Pont factors, we find that opposer has not proven that the use of applicant's mark BM BODYMAN and design for the identified services is likely to cause confusion with BOD and BOD MAN for opposer's goods.

Decision: The opposition is dismissed.

---

plaintiff's mark to be famous, the sales and advertising figures recited in that opinion were from the early 1980s.

[23] As noted, the sales figures for opposer's products show that opposer has achieved some degree of success with its BOD/BOD MAN brand. Although the sales and advertising figures provide some evidence of the strength of opposer's marks, they are counterbalanced by the suggestiveness of the marks, due to the suggestiveness of the word BOD and the descriptiveness of the word MAN for body sprays for men. Accordingly, opposer has not shown that its marks are entitled to a broad scope of protection.